KEENAN v DAWSON

Docket No. 265725. Submitted March 13, 2007, at Grand Rapids. Decided
June 5, 2007, at 9:00 a.m.

Kevin and Tamara Keenan, the maternal grandparents of Alexander
L. Dawson, brought an action in the Kent Circuit Court, Family
Division, against their grandson's father, Timothy A. Dawson,
seeking grandparenting time with the child pursuant to MCL
722.27b after the defendant refused to allow visitation following
the death of Julia Dawson, who was the plaintiffs' daughter, the
defendant's wife, and the child's mother. After conducting a
hearing, the court, Patricia D. Gardner, J., issued an order grant-
ing grandparenting time to the plaintiffs. The defendant appealed.

The Court of Appeals *held*:

MCL 722.27b(4)(b), as applied to the defendant, does not
violate his substantive due process constitutional right to raise the
child as he sees fit. The statute provides for a presumption that a
fit parent's decision to deny grandparenting time does not create a
substantial risk of harm to the child's mental, physical, or emo-
tional health. The statute allows a grandparent to rebut this
presumption with proof by a preponderance of the evidence that
the parent's decision to deny grandparenting time creates a
substantial risk of harm to the child's mental, physical, or emo-
tional health. In this case, the trial court complied with the statute
by recognizing that the burden of proof was on the plaintiffs and
that the defendant was entitled to a presumption that his decision
not to allow grandparenting time did not create a substantial risk
of harm to the child. In deciding that the presumption was
rebutted by the plaintiffs, the trial court's finding, that visitation
with the plaintiffs will help reduce the substantial risk of emo-
tional harm to the child arising from the loss of his mother at an
early age, was not against the great weight of the evidence
presented.

Affirmed.

*Dykema Law Office, P.C.* (by *Jayne A. Dykema*), and
*Scott Bassett* for the plaintiffs.

*Bregman & Welch* (by *Judy E. Bregman*) for the defendant.

Before: O'CONNELL, P.J., and MURRAY and DAVIS, JJ.

MURRAY, J. This case involves a constitutional challenge to MCL 722.27b(4), as amended in 2004, which codifies the standards and procedures for awarding "grandparenting time." In this case the trial court ruled that the maternal grandparents, plaintiffs Kevin and Tamara Keenan, were entitled to grandparenting time, and subsequently ordered a stipulated grandparenting time schedule. On appeal, defendant, Timothy A. Dawson, makes several challenges to the constitutionality of this statute. We hold that the trial court's findings were not clearly erroneous, and that the statute is constitutional as applied to defendant. Consequently, we affirm.

### I. FACTS AND PROCEEDINGS

On March 28, 2003, Alexander Lyle Dawson was born to Julia Dawson and defendant, Timothy Dawson.[1] However, on January 3, 2005, approximately 20 months later, Julia was found dead, very likely the result of murder. After Julia's death, and after Dawson refused to allow them to visit with Alex, the Keenans sought grandparenting time with Alex through the court system. The trial court conducted an evidentiary hearing over the course of two days. During the hearing the Keenans presented their own testimony, as well as that of Paul Terrell (Julia's first husband) and clinical psychologist Julia Schaefer-Space. Dawson presented the testimony of psychologist Dr. Thomas Spahn.

---

[1] Julia and Dawson had each been previously married. Julia had one prior child, Kevin (age 5), while Dawson had two children from his prior marriage.

Rather than recounting the testimony of all these witnesses, we will merely summarize the evidence, and let the trial court's more extensive findings of fact speak to the details. In general, the evidence showed that Julia had a good relationship with her parents until 2000, when she "met" Dawson on the Internet and quickly moved in with him. Thereafter, and continuing until a few months before Julia disappeared in December 2004, Julia and her mother had a very strained relationship. Things became so bad that at one point, Julia sought, but was denied, a personal protection order against her mother. There were also bad feelings between Dawson and Tamara Keenan, with threats being made by Dawson to Tamara, and with Tamara testifying against Dawson in a child custody case between Dawson and his ex-wife.[2] The evidence suggested that, because of this strained relationship, Tamara had only seen Alex on four occasions during his first 20 months of life.

The first time Tamara had contact with Julia after Alex was born was in the summer of 2003, when Julia called and asked if she could move back home. According to Tamara, Dawson told Julia that "she could never leave with [Alex]." Julia discussed divorcing Dawson in the fall of 2003, but decided to wait until after the holidays to file for divorce. Julia then told Tamara that she was going to wait until after she got her income tax refund in February 2004, so that she could use the money to file for divorce. Tamara testified that Julia hired an attorney, put the retainer on her credit card, and had the receipt mailed to the Keenans' address. Tamara testified that by the fall of 2004, Julia "very much wanted to leave Tim, but did not have a certain

---

[2] The Keenans suspect that Dawson murdered Julia, but no charges related to her murder have been filed.

time that she wanted to, but still did." By that time, Julia "did not care if she got in trouble."[3]

The evidence showed that, during the 2000-2004 period, Julia had a much better, and closer, relationship with her father. Kevin testified that after Alex was born, Julia would bring Alex with her when they met for lunch. According to Kevin, he spent a good number of hours with Alex during these lunches, as well as at other times when he met Julia and Alex. Kevin believed it was important for him to continue his relationship with Alex, because Alex "is going to want to know about his mother. There's just no doubt about it. He's going to start asking all kinds of questions. . . . He's going to go to school, Mother's Day is going to come up and he's going to want to know why . . . . So nobody knows our daughter better than us, and a good way to tell Alex about Julia would be to allow grandparenting time." In Kevin's opinion, "all kids need their grandparents, even if for a little bit of time."

Julia Schaefer-Space, the clinical psychologist offered as a witness by the Keenans, testified that if the Keenans were a positive influence, "[i]t would be vital to have as much extended family involved in a two-year-old's life as possible upon the tragedy of losing his birth mother." She acknowledged that "memory doesn't really start for children until about two-and-a-half years

---

[3] With regard to Kevin, Julia's other son, Paul Terrell testified that the Keenans had been Kevin's primary caregivers since Julia's disappearance. The Keenans also paid Kevin's preschool tuition. Terrell testified that Julia became upset when she learned that, contrary to her wishes, Paul had facilitated a relationship between their son, Kevin, and her parents. Julia's objection to the relationship between Kevin and her parents apparently occurred after Tamara spoke to the police about an alleged break-in that occurred at the Dawsons' home. Paul testified that once Julia married Dawson, her relationships with others became strained.

of age" and that Alex "will not actually have absolute memories related to his mother," but opined that "it would be vital to make sure that a link connecting [Alex] to his mother through her parents would be available to him because . . . that's how they'll be able to keep her memory alive in [Alex's] world, in his mind and in his memory." Schaefer-Space indicated her general belief that "a grandparent's relationship is vital in a child's life," even if no prior relationship existed.

Dr. Thomas Spahn, a psychologist offered by Dawson, testified that Dawson was "quite supportive" of Julia, and he never heard Julia "talk very favorably about her contact with her parents or believing that that was . . . extremely . . . valuable to her or the child." And although Dr. Spahn found no evidence to suggest that Dawson prevented Julia from seeing her parents, Dr. Spahn testified that a two-year-old would have no memory, or a very light memory, of people that he had not seen for more than six months. Interestingly, Dr. Spahn declined to offer an opinion about whether Alex would be at a substantial risk of emotional harm if he did not see the Keenans.

In ruling for the Keenans, the trial court opined on the record as follows:

> This is an emotional issue and an emotional time for the Keenans and Mr. Dawson. It is unfortunate that Mr. Dawson was unable to participate and testify in these proceedings today.[4] However, the Court has considered the testimony of Dr. Spahn who has had quite a lengthy relationship with Mr. Dawson, and *the Court does find that it is appropriate to assert the presumption considered by the legislature of this state that Mr. Dawson is a fit parent and that denial of grandparenting time does not create a substantial risk of harm to Alex's mental, physical, or emotional health.* The legislature further goes on to say that

---

[4] Apparently Dawson attempted suicide after the first hearing and did not attend the second and final hearing.

the Court shall impose the standard, the burden of proof upon the grandparents by the preponderance of the evidence. Although the statute goes on to indicate that if that is deemed to be unconstitutional by a higher court, that then the legislature would adopt the clear and convincing standard.

*The Court would indicate that today the standard applied by the Court is the preponderance of the evidence or majority of the evidence. The Court is called to determine whether Mr. and Mrs. Keenan have proven by the preponderance of the evidence that the denial by Mr. Dawson [of] grandparenting time will create a substantial risk of harm to Alex's mental, physical, or emotional health.* The Court has considered the testimony of Mr. and Mrs. Keenan. I believe that both testified honestly about difficult family matters that were heartfelt. They testified that their daughter, Julia, was acknowledged to be missing on December 12, 2004, and that tragically she was found to be deceased on January 3, 2005. Foul play is suspected as a result of her death. And further, the Court has received tangential information that Mr. Dawson is a suspect in her alleged murder.

\* \* \*

The Court would note that Alex was born on March 28, 2003. He was not even two years old at the time of his mother's disappearance and subsequent death. It is true that regardless of whether the Keenans had a strong established relationship or weak established relationship, it is likely that Alex would have no memory of those young years and experiences. Ms. Schaefer-Space did indicate that, in her opinion, to support Alex's mental, physical, and emotional health, it was vital for Alex to have his mother's memory kept alive for him since he had lost his mother through these tremendously unfortunate circumstances.

The Court further was persuaded by Mr. Keenan's testimony that it is his desire to establish a relationship with Alex to enhance Alex's knowledge of his mother and to inform him about his maternal role, including what foods his mom liked, his mom's medical history, her preference

with regard to music, instruments, and other quirky behaviors that it's just nice to know about your parents.

*The Court does find that this child has experienced such a tragedy in his life that it is critical to Alex's mental and emotional health to have additional support with regard to his maternal grandparents to enhance his memory and recollection, love and support that he received from his mother during the time that she was alive and loved and cared for him.*

Therefore, the Court does make a finding that Mr. and Mrs. Keenan have proven by the preponderance of the evidence that Mr. Dawson's decision to deny all access to Alex will create a substantial risk of harm to Alex's mental and emotional health. We shall proceed to phase two of the proceeding where the Court will consider the best interest factors prior to setting the grandparenting time. [Emphasis supplied.]

On September 19, 2005, the trial court entered a stipulated order regarding grandparenting time. The order reiterated the trial court's finding that plaintiffs had demonstrated, by a preponderance of the evidence, that defendant's denial of grandparenting time created a substantial risk of harm to Alex's mental, physical, or emotional health. The order set out a stipulated grandparenting time schedule, without prejudice to defendant's right to appeal the trial court's determination.[5]

## II. ANALYSIS

### A. BACKGROUND

As noted in the introduction to this opinion, defendant makes several separate constitutional attacks on

---

[5] On December 28, 2005, the trial court granted Dawson's motion for a stay of proceedings, which only stayed the trial court's order awarding grandparenting time until this Court decided defendant's motion for a stay. That motion was denied by this Court on December 22, 2005. As of the time of this appeal, Dawson and Alex live out-of-state.

the statute. In order to address these arguments, we first need to review the context in which MCL 722.27b was amended in 2004.

Two decisions, *Troxel v Granville*, 530 US 57; 120 S Ct 2054; 147 L Ed 2d 49 (2000), and *DeRose v DeRose*, 469 Mich 320; 666 NW2d 636 (2003), directly led to the 2004 amendment of MCL 722.27b. In *Troxel*, the United States Supreme Court reviewed a Washington statute that allowed "any person" to seek visitation with a child "at any time," as long as a court found it to be in the best interests of the child. *Troxel, supra* at 67. Because of this "breathtakingly broad" language, *id.*, the fact that neither the statute nor the court provided any "special weight" to a fit parent's "substantive due process" constitutional right to raise their child, *id.* at 65-67, and because neither the court nor the statute placed the burden of proof on the movant, the plurality held the Washington statute unconstitutional as applied to Troxel. *Id.* at 67-70. Importantly, however, the *Troxel* plurality did not spell out any specific constitutional requirements that a legislature or court must follow in addressing grandparent visitation. Instead, it simply concluded that the broad statute's failure to give any special weight to a fit parent's decision was unconstitutional as applied in that case. *Id.* at 75. Three years later our Supreme Court decided *DeRose v DeRose*. In that case, the Court held MCL 722.27b unconstitutional on the sole ground that it had no requirement that a trial court grant any deference to a fit parent's decision regarding the upbringing of his or her child. *DeRose, supra* at 333-334.[6]

_____

[6] The Court did note that in other respects the Michigan statute was much more narrow than the Washington statute at issue in *Troxel*. *Id.* at 334 n 10.

In response, the Legislature attempted to correct the
constitutional infirmities of the grandparenting time
statute, ultimately enacting the current version of MCL
722.27b(4), which provides in relevant part:

> (b) In order to give deference to the decisions of fit parents,
> it is presumed in a proceeding under this subsection that a fit
> parent's decision to deny grandparenting time does not create
> a substantial risk of harm to the child's mental, physical, or
> emotional health. To rebut the presumption created in this
> subdivision, a grandparent filing a complaint or motion under
> this section must prove by a preponderance of the evidence
> that the parent's decision to deny grandparenting time cre-
> ates a substantial risk of harm to the child's mental, physical,
> or emotional health. If the grandparent does not overcome
> the presumption, the court shall dismiss the complaint or
> deny the motion.

> (c) If a court of appellate jurisdiction determines in a
> final and nonappealable judgment that the burden of
> proof described in subdivision (b) is unconstitutional, a
> grandparent filing a complaint or motion under this
> section must prove by clear and convincing evidence that
> the parent's decision to deny grandparenting time cre-
> ates a substantial risk of harm to the child's mental,
> physical, or emotional health to rebut the presumption
> created in subdivision (b).

With this background in mind, we now turn to defen-
dant's challenges to the trial court's decision.

### B. STANDARD OF REVIEW

#### 1. FOR A CHALLENGE TO THE GRANDPARENTING TIME ORDER

"Orders concerning [grand]parenting time must be
affirmed on appeal unless the trial court's findings were
against the great weight of the evidence, the court
committed a palpable abuse of discretion, or the court
made a clear legal error on a major issue." *Pickering v
Pickering*, 268 Mich App 1, 5; 706 NW2d 835 (2005). A

trial court's findings of fact are not against the great weight of the evidence unless the evidence clearly preponderates in the opposite direction. *Fletcher v Fletcher*, 447 Mich 871, 878; 526 NW2d 889 (1994).

### 2. FOR A CONSTITUTIONAL CHALLENGE

Proving that a statute is unconstitutional is no easy task. Our Supreme Court has both recently and long ago held that we must presume that the Legislature, when acting within its legal sphere, acts constitutionally. *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 294; 715 NW2d 846 (2006); *In re Harrand*, 254 Mich 584, 589; 236 NW 869 (1931). Accordingly, "[a] party challenging the facial constitutionality of a statute faces an extremely rigorous standard," *Wayne Co Board of Comm'rs v Wayne Co Airport Auth*, 253 Mich App 144, 160-161; 658 NW2d 804 (2002), such that the defendant "must establish that no circumstances exist under which it would be valid." *Id.* at 160. "When faced with a claim that application of a statute renders it unconstitutional, the Court must analyze the statute 'as applied' to the particular case." *Crego v Coleman*, 463 Mich 248, 269; 615 NW2d 218 (2000).

Although defendant's brief enumerates three separate constitutional arguments, we believe that defendant has posited only two: (1) that the statute is facially unconstitutional and (2) that, as applied to his circumstance, the statute is unconstitutional. As detailed below, we decline to address the first argument because it was not properly preserved. As to the second issue, we reject defendant's argument that the statutory provision as applied in this case violated his constitutional rights.

## C. FACIAL CHALLENGE

Defendant's facial challenge to MCL 722.27b is that the Legislature's failure to define the phrase "substantial risk of mental, physical or emotional harm" left the statute unconstitutionally broad or vague. Unfortunately, defendant did not present this issue to the trial court, and therefore it is not properly preserved for review by this Court. *STC, Inc v Dep't of Treasury,* 257 Mich App 528, 538; 669 NW2d 594 (2003).[7] And, although we have the discretion to address unpreserved constitutional questions, *Heltzel v Heltzel,* 248 Mich App 1, 15; 638 NW2d 123 (2001), we decline to do so in this case because we can address the main constitutional arguments presented by defendant in his as-applied challenge.

## D. AS-APPLIED CHALLENGE

We now take on defendant's primary argument, that in light of *Troxel* and *DeRose* and the facts in this case, the trial court violated defendant's constitutional right to raise his child by failing to actually give deference to his decision. Separately, defendant argues that the trial court erred in finding that the need to keep Julia's memory alive meets the substantial risk of harm stan-

---

[7] Defendant also does not forcefully present the argument to this Court. In his brief, defendant asserts that he "is not very interested in extensively discussing a facial attack on MCL 722.27b(4), [as] [h]e does not really claim that the statute can never be applied under any circumstances without violating numerous constitutional requirements." At oral argument before this Court, defendant's counsel indicated that defendant's real focus is on the as-applied argument. These concessions provide additional support for our decision not to address any facial challenge to the statute, but to instead decide the constitutional issue through defendant's as-applied challenge. *J & J Constr Co v Bricklayers & Allied Craftsman, Local 1,* 468 Mich 722, 734; 664 NW2d 728 (2003).

dard of the statute, thereby violating his substantive due process rights.

At the outset we note that plaintiffs do not challenge the trial court's ruling that because Dawson is a fit parent, the statutory presumption—that Dawson's decision did not create a substantial risk of harm to Alex—applied. Defendant, however, argues that because the trial court's decision was essentially based only on the finding that grandparents are important for a young child, the trial court's decision interfered with his constitutional right to raise Alex as he sees fit.

The difficulty we have with this argument is that the trial court's decision was not so simplistic. Instead, when we carefully review the trial court's findings of fact that support its conclusion, we see that the trial court's decision was multi-faceted. For sure, this was not merely a case where the trial court concluded that "grandparenting is good, therefore it should occur." Rather, the trial court found, on the basis of the testimony of Dr. Schaefer-Space, that Alex is and will be subject to emotional harm and turmoil in light of his mother's death. Additionally, both psychologists touched on the fact that a two-year-old child will have no lasting memory of persons in his or her life and, therefore, Alex would have no memory of his mother, Julia. The trial court's conclusion, that visitation with the maternal grandparents will help reduce the substantial risk of emotional harm and suffering that Alex will experience as he grows older, was not clearly erroneous.

Consequently, the trial court did not merely give "lip service" to the statutory presumption when it ruled in favor of the Keenans. It also did not merely second-guess defendant's decision because it thought grandparenting time was generally a good thing for children.

Rather, after considering all the testimony about the harms that a young child can suffer when a parent dies and that part of the family is "cut off" from the child, the trial court concluded that defendant's decision to deny Alex time with his deceased mother's parents would cause substantial harm to Alex, given Julia's untimely death and the substantial likelihood that Alex will have an inability to remember his mother. That decision, which was based on the evidence and in consideration of the presumption, did not improperly interfere with defendant's constitutional right to raise Alex as he sees fit.

Both sides cite cases from across the nation that purportedly support their respective positions. But after canvassing these and other decisions, we conclude that none of them contains facts or law substantially similar to those that are present in this case. For example, in many of the cases relied on by plaintiffs, the grandparent had a substantial relationship with an older grandchild before the child's parent passed away. See, e.g., *Hiller v Fausey*, 588 Pa 342, 344-345; 904 A2d 875 (2006) (an eight-year-old grandchild had almost daily contact with grandparents for the last two years of mother's life); *Hamit v Hamit*, 271 Neb 659, 679-680; 715 NW2d 512 (2006) (grandparents had very close and beneficial relationship with grandchildren, with almost daily interaction, before father died in plane crash); *Harrold v Collier*, 107 Ohio St 3d 44, 52; 836 NE2d 1165 (2005) (court upheld grandparent visitation as constitutional in large part because "[the grandparents] raised Brittany for the first five years of her life.").

Likewise, many of the cases relied on by defendant are unpersuasive because they involve statutory or caselaw requirements different from those we must apply under MCL 722.27b(4). See, e.g., *Vibbert v Vibbert*,

144 SW3d 292 (Ky App, 2004) (requiring use of a clear and convincing standard of proving best interests of child); *In re Petition of RA, Jr,* 121 P3d 295 (Colo App, 2005), rev'd 137 P3d 318 (2006) (requiring grandparent to show "compelling reason" to obtain visitation). These are but a handful of recent, post-*Troxel* cases that have addressed the constitutional requirements for awarding grandparent visitation when a parent has died and a dispute ensues between the surviving parent and the grandparent. There are many more. See anno: *Grandparent's visitation rights where child's parents are deceased, or where status of parents is unspecified,* 69 ALR 5th 1.[8]

This case is also unlike *Troxel* in two important respects. First, as the plurality specifically noted, the parent had not entirely cut off visitation, as the dispute was over how much time the grandparents would receive. *Troxel, supra* at 70. Second, the trial court had not only failed to give any special weight to the parent's decision, it had presumed the visitation would be in the best interest of the child. *Id.* at 69-71. In the present case, defendant has sought to entirely preclude visitation, and the trial court in fact applied the statutory presumption in favor of defendant's decision. And, we believe, that is the overriding teaching of *Troxel. Id.,* see also *Soohoo v Johnson,* 731 NW2d 815 (Minn, 2007) (holding that *Troxel's* guiding principles are (1) giving special weight to a fit parent's decision, (2) not presum-

---

[8] *Oliver v Feldner,* 149 Ohio App 3d 114; 776 NE2d 499 (2002), cited by defendant, is one of the most analogous cases. However, as far as we can tell, there was no testimony from a licensed professional in *Feldner* regarding the harm to a young child in not having contact with the parents of a deceased parent. Testimony such as that, which is specialized and related directly to the well-being of the child, can tip the scales one way or the other, see *In re Estate of STT,* 144 P3d 1083, 1095 (Utah, 2006), as it does in this case.

ing visitation is in the child's best interest, and (3) performing more than a simple best interest analysis before awarding visitation.)

In the end, we must base our decision on whether the trial court followed Michigan's statute and whether it applied that statute to the facts as found by that court. Clearly, the trial court complied with the statute, in that it recognized that the burden of proof was on plaintiffs and that a presumption existed that defendant's decision did not cause Alex a substantial risk of harm. After doing so, the trial court concluded that plaintiffs had met their burden of proof, and, as we have explained, the evidence supported that conclusion. The trial court could not have done more.

Affirmed.