# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 16, 2016

Plaintiff-Appellee,

v

No. 326149
Kent Circuit Court
LC No. 13-009055-FC

ABIGAIL MARIE SIMON,

Defendant-Appellant.

Before: SAWYER, P.J., and HOEKSTRA and WILDER, JJ.

PER CURIAM.

Following a jury trial, defendant was convicted of three counts of first-degree criminal sexual conduct (CSC I), MCL 750.520b(1)(b)(*v*),[1] and accosting a minor for immoral purposes, MCL 750.145a. The trial court sentenced defendant to concurrent sentences of 8 to 25 years for the CSC I convictions and 53 days for the accosting conviction. The trial court also ordered defendant to comply with the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*, and that, upon parole, defendant be subject to lifetime electronic monitoring. Defendant appeals as of right. For the reasons explained in this opinion, we affirm defendant's convictions, but remand for *Crosby*[2] proceedings concerning defendant's sentences.

This case concerns sexual conduct between defendant, who was an academic advisor at Catholic Central High School in Grand Rapids, and a 15-year-old sophomore at the school. Defendant was 33 years old. At trial, the victim described numerous sexual acts with defendant and the prosecutor presented extensive evidence of text messages, including sexual messages, between defendant and the victim. Defendant testified that three sexual penetrations occurred, but she claimed that, on each occasion, the victim raped her. Defendant also testified that all the text messages she sent to the victim, including ones where she told the victim that she loved him and ones where they discussed "rough" sex, were done to appease the victim. According to defendant, if she appeased the victim, he would not assault her. The jury convicted defendant as noted above. She now appeals as of right.

---

[1] Defendant was acquitted of a fourth count of CSC I.

[2] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

## I. VOLUNTARINESS INSTRUCTION

On appeal, defendant first argues that the trial court gave an inaccurate and misleading instruction regarding involuntariness because it instructed the jury that an act is not involuntary unless the defendant was unconscious or it was the result of involuntary bodily movement. Defendant asserts that sexual penetration is also "involuntary" when an actor is overcome by force and that, given defendant's testimony and claimed defense, the jury also should have been specifically instructed that an act was involuntary if defendant was overpowered and physically forced to engage in the sexual conduct at issue. According to defendant, the erroneous instruction constituted a structural error, which violated her constitutional right to due process and prevented her from presenting her claimed defense.

We review de novo defendant's claim of instructional error. *People v Dobek*, 274 Mich App 58, 82; 732 NW2d 546 (2007). A trial court must instruct the jury on the applicable law. See *People v McGhee*, 268 Mich App 600, 606; 709 NW2d 595 (2005). Jury instructions must include all the elements of the charged offenses and any material issues, defenses, and theories that are supported by the evidence. *People v Fennell*, 260 Mich App 261, 265; 677 NW2d 66 (2004). Jury instructions are to be read as a whole, rather than extracted piecemeal, to determine whether error requiring reversal occurred. *McGhee*, 268 Mich App at 606. "Even if the instructions are somewhat imperfect, reversal is not required if the instructions fairly presented the issues to be tried and were sufficient to protect the rights of the defendant." *Fennell*, 260 Mich App at 265. Reversal for failure to provide a jury instruction is warranted only if "it appears that it is more probable than not that the error was outcome determinative." *People v McKinney*, 258 Mich App 157, 163; 670 NW2d 254 (2003).

Defendant was charged with CSC I, MCL 750.520b(1)(b)(*v*), which provides:

> (1) A person is guilty of criminal sexual conduct in the first degree if he or she engages in sexual penetration with another person and if any of the following circumstances exists:
>
> * * *
>
> (b) That other person is at least 13 but less than 16 years of age and any of the following:
>
> * * *
>
> (*v*) The actor is an employee or a contractual service provider of the public school, nonpublic school, school district, or intermediate school district in which that other person is enrolled . . . and the actor uses his or her employee, contractual, or volunteer status to gain access to, or to establish a relationship with, that other person.

"Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body . . . ." MCL 750.520a(r).

-2-

The sexual penetration of a person under the age of 16 is a strict-liability offense. *People v Nyx*, 479 Mich 112, 140-141; 734 NW2d 548 (2007) (MARKMAN, J., concurring). See also *In re Hildebrant*, 216 Mich App 384, 386; 548 NW2d 715 (1996). A strict-liability offense does not include a *mens rea* element, but the *actus reus* remains an element of the crime. *People v Likine*, 492 Mich 367, 393; 823 NW2d 50 (2012). In other words, "a strict-liability offense requires the prosecution to prove beyond a reasonable doubt that the defendant committed the prohibited act, regardless of the defendant's intent and regardless of what the defendant actually knew or did not know." *Id.*

When charged with a strict-liability offense, a defendant can admit that the prohibited act was committed, but defend the charge on the basis that the act was committed involuntarily. *Id.* "Examples of involuntary acts that, if proved, provide a defense against the *actus reus* element of a crime include reflexive actions, spasms, seizures or convulsions, and bodily movements occurring while the actor is unconscious or asleep." *Id.* at 393-394. "The common thread running through these 'involuntariness' defenses is that the act does not occur under the defendant's control, and thus the defendant was powerless to prevent its occurrence and cannot be held criminally liable for the act." *Id.* at 394. "One approach is to explain voluntariness as the opposite of involuntariness . . . . An alternative account is of voluntary behavior as *volitional* action—behavior which is intentional under some description, which is 'done because the agent wants to do it.' " *Id.* at 394 n 49 (quotation omitted).

The Supreme Court in *Likine* provided examples of involuntary acts, *id.* at 393-394, but it never indicated that this list was exclusive. In fact, the Supreme Court stated that it was providing "[e]xamples" of involuntary acts. *Id.* at 393. Although not included in the Court's list of specific examples of involuntary acts, we agree with defendant that, where sexual penetration occurs against a defendant's will only because a defendant is physically overcome through force, there is no voluntary act by the defendant. Rather, as opposed to being the perpetrator of criminal sexual conduct, the defendant would essentially be a victim, who was subjected to the sexual conduct involuntarily. See generally *People v Parks*, 483 Mich 1040, 1045; 766 NW2d 650 (2009) (YOUNG, J., concurring) ("'[S]exual conduct' is something that *both* 'actors' *and* 'victims' take part in—'actors' voluntarily and 'victims' involuntarily."). In such circumstances, the sexual penetration would not occur under the defendant's control, nor would it be done because the defendant wanted it done. *Likine*, 492 Mich at 394, 394 n 49. Accordingly, defendant could defend the CSC I charges on the basis that the sexual penetrations were involuntary, and she was entitled to a jury instruction on involuntariness. See *Fennell*, 260 Mich App at 265.

Relevant to the voluntariness of defendant's conduct pertaining to the CSC I counts, the trial court instructed the jury that "the defendant is charged with the crime of first degree criminal sexual conduct. To prove this charge the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the defendant *voluntarily* engaged in a sexual act . . ." (emphasis added). The trial court then gave the following instruction regarding the word "voluntary":

Now, ladies and gentlemen, when I use the word quote/unquote "voluntary" in the first element of criminal sexual conduct, it has a specific legal meaning that is different from the way the word is commonly used. To have

-3-

quote/unquote "voluntarily" engaged in something, the defendant must have made some conscious act. The defendant's act is involuntary only if the act did not occur under the defendant's control, and she was truly powerless to prevent its occurrence.

Now, some examples of involuntary acts that could not be the basis for a crime are spasms, seizures, reflective [sic] actions and movements occurring while the actor is unconscious or asleep. However, if one consciously acts, then that is voluntary for purposes of this element.

In our judgment, the court's instructions on CSC I fairly presented the issue of whether defendant's sexual conduct was involuntary. Consistent with *Likine*, the trial court instructed the jury that an act was involuntary when it "did not occur under the defendant's control, and she was truly powerless to prevent its occurrence." See *Likine*, 492 Mich at 394. This broad explanation of involuntariness encompassed defendant's claim that her actions were involuntary because the victim physically overcame her and forced her to submit to sexual conduct against her will. In other words, had the jury believed defendant's version of events, it would have found her not guilty of CSC I on the basis of this instruction. Considered as a whole, the instruction given was sufficient to protect defendant's rights and she has not shown a reasonable probability of a different outcome had more detailed instructions on her specific claim been given to the jury.

In contrast to this conclusion, defendant's argument regarding why the jury instructions failed to fairly present the involuntariness defense is two-fold. First, defendant claims that the phrases "conscious act" and "consciously acts" in the instructions indicate that an act is involuntary only if the defendant is unconscious, i.e., not having consciousness. While the word "conscious" can mean "having mental faculties undulled by sleep, faintness, or stupor," it can also mean "capable of or marked by thought, will, design, or perception." *Merriam-Webster's Collegiate Dictionary* (2014). Read in the context of the voluntariness instruction as a whole, the terms "conscious" and "consciously" refer not to an act done while the defendant was not unconscious, but to an act that was marked by thought, will, design, or perception. Stated differently, read in context, the phrases indicate that the defendant's act, to be voluntary, must have been an act chosen by the defendant. This conclusion is supported by the second sentence in the definition of "voluntary," which provides that an act "is voluntary only if the act did not occur under the defendant's control, and she was truly powerless to prevent its occurrence." Pursuant to this sentence, an act is voluntary only if it occurred under the defendant's control and the defendant had power to prevent its occurrence, which requires more than just the defendant's faculties being undulled by sleep, faintness, or stupor.

Second, defendant claims that the examples that the trial court provided of involuntary acts were irrelevant and had to have led to the jury concluding that "any 'conscious' bodily act, even if physically forced against a defendant[]" was a voluntary act. The examples of involuntary acts that the trial court gave to the jury—spasms, seizures, reflexive actions, and movements while the defendant is unconscious or asleep—were not specifically applicable to the present case. However, the trial court stated it was giving "some examples" of involuntary acts. It did not state that the list of examples it gave was an exclusive list of involuntary acts. Thus, contrary to defendant's contention, the instructions did not limit involuntary acts to those that

-4-

occurred while defendant was unconscious and those that resulted from involuntary bodily movement. Rather, when the jury instructions regarding involuntariness are read as a whole, the instructions fairly presented the involuntariness defense. According to the instructions, defendant was only guilty of CSC 1 if she "voluntarily engaged" in the sexual penetrations, meaning that she engaged in "conscious acts," such that the penetrations occurred under her control and she was not powerless to prevent them. There was no instructional error.

## II.  JUDICIAL FACT-FINDING

Next, defendant argues that she is entitled to be resentenced for her CSC I convictions because the trial court engaged in judicial fact-finding when scoring the sentencing guidelines and the fact-finding resulted in an increased minimum sentence range. We agree that the trial court engaged in fact-finding which resulted in an increased minimum sentence range. However, contrary to defendant's arguments, the appropriate remedy is a *Crosby* remand, not resentencing.

In *People v Lockridge*, 498 Mich 358, 373-374; 870 NW2d 502 (2015), the Supreme Court held that the sentencing guidelines violate a defendant's Sixth Amendment right to a jury to the extent that offense variables are scored on the basis of facts not admitted by the defendant or found by the jury and that those judicially found-facts increase the defendant's mandatory minimum sentence. To cure the constitutional violation, the Supreme Court held that the sentencing guidelines were advisory, rather than mandatory. *Id.* at 391. In this case, defendant preserved her claim by objecting to judicial fact-finding at sentencing, and the record shows that judicial fact-finding increased her minimum sentence range under the legislative guidelines. For example, in scoring offense variable (OV) 4 at 10 points, the trial court determined that the victim suffered serious psychological injury and, when scoring OV 19 at 10 points, the trial court determined that defendant interfered with the administration of justice. As scored, defendant's total OV score is 55, meaning that the trial court's judicial fact-finding in relation to these variables increased defendant's minimum sentence range from 35 (level II) to 55 (level III). Because the trial court relied on facts that were neither found by the jury nor admitted by defendant in order to calculate the minimum sentence range, and because the judicially-found facts resulted in an increased minimum sentence range, defendant's Sixth Amendment right to a jury was violated. See *People v Stokes*, 312 Mich App 181, 194; ___ NW2d ___ (2015).

In terms of the appropriate remedy for this violation, defendant argues that, because she preserved her Sixth Amendment claim, she should be resentenced in keeping with *United States v Lake*, 419 F3d 111, 113-114 & n 2 (CA 2 2005). However, in *Stokes*, 312 Mich App at 198-203, this Court chose not to follow *Lake* and held that a *Crosby* remand was the proper remedy for a preserved Sixth Amendment violation. Given this Court's decision in *Stokes*, the remedy for the violation of defendant's Sixth Amendment right to a jury trial is a *Crosby* remand as set forth in *Lockridge*, 498 Mich at 398. See *Stokes*, 312 Mich App at 198-203. We remand for such proceedings.

## III.  OFFENSE VARIABLE SCORING

Defendant also argues that she is entitled to be resentenced because the trial court erred in scoring offense variables 4, 10, and 19.

We review a trial court's factual determinations made in scoring the sentencing guidelines for clear error. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). A finding is clearly erroneous when we are left with a definite and firm conviction that a mistake has been made. *People v Brooks*, 304 Mich App 318, 319-320; 848 NW2d 161 (2014). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Hardy*, 494 Mich at 438. See also *People v Steanhouse*, __ Mich App __, __; __ NW2d __ (2015); slip op at 19.

Ten points may be scored for OV 4, MCL 777.34, which concerns psychological injury to a victim, if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). In scoring OV 4, a trial court may not merely assume that someone in the victim's position would have suffered serious psychological injury. *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012). Actual treatment is not required for the scoring of OV 4. MCL 777.34(2). However, evidence that a victim received counseling may support the scoring of this variable. See, e.g., *People v Davenport (After Remand)*, 286 Mich App 191, 200; 779 NW2d 257 (2009). In this case, at sentencing, the victim's mother informed the trial court that the victim had gone to counseling a few times since his relationship with defendant was discovered, and she specified that he underwent this counseling because he had been "a victim," not because of other reasons such as his sister's recent death. Given this evidence that the victim went to counseling as a result of defendant's actions, the trial court did not clearly err in finding that the victim suffered serious psychological injury requiring treatment. See *id.* We affirm the 10-point score for OV 4.

Ten points may be scored for OV 10, MCL 777.40, which addresses exploitation of a vulnerable victim, if "[t]he offender exploited a victim's physical disability, mental disability, youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). The term "exploit" means "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b). However, points may only be assigned to OV 10 if the victim was vulnerable. *People v Cannon*, 481 Mich 152, 158; 749 NW2d 257 (2008). The mere existence of one or more factors listed in MCL 777.40(1)(b) does not automatically equate to victim vulnerability. MCL 777.40(2); *Cannon*, 481 Mich at 158-159. Instead, the term "vulnerability" is defined as "the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation." MCL 777.40(3)(c).

The trial court scored 10 points for OV 10 based on the facts that the victim was a 15-year-old student while the 33-year-old defendant held a position of authority as a school employee and the victim's tutor. We see nothing clearly erroneous in the trial court's conclusion. The evidence demonstrates that the victim's youthfulness left him susceptible to persuasion or temptation by defendant and that defendant exploited this vulnerability for her own unethical and selfish purposes. Cf. *People v Johnson*, 474 Mich 96, 103; 712 NW2d 703 (2006) (finding that the 20-year-old defendant exploited his 15-year-old victim in a CSC case). In particular, Thomas Cottrell, an expert in child sexual abuse, explained at trial that adolescents are not prepared to make adult decisions, and this testimony supports the conclusion that the 15-year-old victim, who had a crush on defendant, was vulnerable to persuasion and temptation. The evidence also indicates that defendant exploited this vulnerability by, for example, using tutoring sessions to begin a personal relationship with the victim, moving her meetings with the

victim outside of the school to restaurants and later her apartment, and eventually initiating sexual conduct with the victim. Over the course of many weeks, she then continued exploiting the victim's youthful infatuation with her for her own selfish and unethical purposes, telling the victim that she loved him and teaching him to engage in "rough" sex. Based on this evidence, the trial court did not clearly err in finding that defendant exploited the victim's youth. *Hardy*, 494 Mich at 438. We affirm the 10-point score for OV 10.

Ten points may be scored for OV 19, MCL 777.49, which concerns threats to the security of a penal institution or court or interference with the administration of justice or the rending of emergency services, if "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice." MCL 777.49(c). "[T]he plain and ordinary meaning of 'interfere with the administration of justice' . . . is to oppose so as to hamper, hinder, or obstruct the act or process of administering judgment of individuals or causes by judicial process." *People v Hershey*, 303 Mich App 330, 343; 844 NW2d 127 (2013). Points can be assigned to OV 19 for conduct that occurs before criminal charges are filed. *Id.* Conduct that constitutes an interference or attempted interference with the administration of justice includes telling the victim or a witness not to disclose the defendant's conduct. *People v Steele*, 283 Mich App 472, 493; 769 NW2d 256 (2009).

In this case, the trial court scored OV 19 based on defendant's efforts to hamper the process of administrating justice after her relationship with the victim was discovered. In particular, after defendant's relationship with the victim was discovered, police told defendant not to have any contact with the victim. Nevertheless, according to the victim, about a month later, defendant created a Twitter account and "tweeted" him. They sent private messages to each other over Twitter. They also sent email messages and talked on the telephone. Defendant tried to keep this contract secret by, for example, questioning the victim's use of telephones that could be "tapped" by police. Most significantly, in some of their communications, defendant told the victim to take steps to stop the investigation. In a June 12, 2013 email, defendant wrote, "I love you. Tell your mom you need this gone now. I need to be with you." In a June 16, 2013 email, defendant wrote, "I really miss you a whole lot. Are you having a good birthday? Did you talk to your momma at all?" Consistent with defendant's remarks, the victim spoke with his mother about ending the investigation. Based on defendant's conduct, the trial court's finding that defendant attempted to interfere with the administration of justice was not clearly erroneous. We affirm the trial court's scoring of OV 19. Because the trial court did not clearly err in the scoring of OVs 4, 10, and 19, defendant is not entitled to resentencing on this basis.

## IV. DEFENDANT'S EXERCISE OF HER RIGHT TO A TRIAL

With regard to sentencing, defendant also argues that the trial court impermissibly considered defendant's decision to go to trial and gave defendant a harsher sentence for exercising her right to present a defense. Given this purported impropriety by the trial court, defendant maintains that she entitled to resentencing.

In a criminal prosecution, a defendant has a constitutional right to a jury trial. US Const, Am VI; Const 1963, art 1, § 20. A defendant's right to due process, US Const, Am XIV, includes the right to present a defense. *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006). In sentencing a defendant, a trial court may not consider factors that violate a

defendant's constitutional rights. *People v Godbold*, 230 Mich App 508, 512; 585 NW2d 13 (1998). Consequently, a defendant may not be penalized at sentencing for refusing to admit guilt, *People v Conley*, 270 Mich App 301, 315; 715 NW2d 377 (2006), or for exercising his or her right to a jury trial, *People v Mosko*, 190 Mich App 204, 211; 475 NW2d 866 (1991), aff'd 441 Mich 496 (1992).

In this case, before it imposed sentence, the trial court outlined its various general thoughts and observations for the parties. In doing so, the trial court commented on the fact that defendant exercised her right to a jury trial.[3] It stated that there were zero winners at trial, explaining that "[e]verybody who's had anything to do with it . . . has lost." The trial court further stated that "the whole course of this trial . . . made a bad situation much, much worse than it had to have been." However, the trial court prefaced these specific remarks by stating that it held nothing against defendant for going to trial and that it was "not going to sentence her in any way, shape, or form because she went to trial other than things I might have learned as a result of the trial itself." Given these express remarks by the trial court, there is no merit to defendant's contention that the trial court increased her sentence based on her exercise of her right to go to trial. Defendant is not entitled to resentencing on this basis.

## V. LIFETIME ELECTRONIC MONITORING

Finally, defendant argues that lifetime electronic monitoring (LEM) is unconstitutional because it constitutes an unreasonable search under the Fourth Amendment and is cruel and/or unusual punishment. Defendant asserts that the statutes imposing LEM are unconstitutional on their face and as applied to defendant. We disagree.

We review constitutional issues de novo. *People v Sadows*, 283 Mich App 65, 67; 768 NW2d 93 (2009). A statute is presumed to be constitutional, and the party challenging the statute's constitutionality bears the burden of proving its invalidity. *People v Boomer*, 250 Mich App 534, 538; 655 NW2d 255 (2002).

---

[3] In support of her argument, defendant also notes that the trial court compared defendant's conduct to that of Jamila Williams, a Grand Rapids teacher who engaged in sex with four students. Williams pleaded guilty to three counts of third-degree criminal sexual conduct (CSC III) and one count of second-degree criminal sexual conduct (CSC II). The trial court sentenced Williams to 95 months to 15 years' imprisonment. Given that Williams had sex with four students, defendant maintains that Williams's conduct was more egregious than defendant's and that the only reason defendant received a higher sentence was that, unlike Williams, defendant exercised her right to a trial. Defendant's argument is based on the false premise that Williams' conduct was more serious, ignoring the fact that she was ultimately convicted of more serious offenses than Williams. The maximum sentence for CSC I, a class A crime, MCL 777.16y, is life imprisonment, MCL 750.520b(2)(a), while the maximum sentence for CSC III, a class B Crime, MCL 777.16y, is 15 years, MCL 750.520d(2). Because defendant was convicted of a more serious offense than was Williams, her conduct could certainly be considered more egregious, and to the extent the trial court mentioned Williams, this discussion does not lead us to conclude that the trial court punished defendant for exercising her right to a trial.

MCL 750.520n provides:

> A person convicted under [MCL 750.520b (the CSC I statute)] or [MCL 750.520c (the CSC II statute)] for criminal sexual conduct committed by an individual 17 years old or older against an individual less than 13 years of age shall be sentenced to lifetime electronic monitoring as provided under . . . MCL 791.285.

See also MCL 750.520b(2)(d) (providing that the trial court shall sentence a defendant convicted of CSC I to LEM under MCL 750.520n); MCL 750.520c(2)(b) (requiring trial courts to sentence a defendant convicted of CSC II to LEM under MCL 750.520n if the criminal sexual conduct was committed by a defendant 17 years of age or older against an individual less than 13 years of age).[4] LEM is punishment and is part of a defendant's sentence. *People v Cole*, 491 Mich 325, 335-336; 817 NW2d 497 (2012). A defendant who is sentenced to LEM shall wear, from the time the defendant is released on parole or from prison until her death, an electronic monitoring device, MCL 791.285(1)(a), (2), by which, through global position system satellite or other means, the defendant's movement and location can be tracked and recorded. MCL 791.285(1)(b), (2).

## A. FOURTH AMENDMENT SEARCH AND SEIZURE

The Fourth Amendment of the United States Constitution, US Const, Am IV, guarantees every person's right to be free from unreasonable searches and seizures. *People v Slaughter*, 489 Mich 302, 310; 803 NW2d 171 (2011). The government conducts a search when, pursuant to a satellite-based monitoring program for sex offenders, it attaches a device to a person's body, without consent, for the purpose of tracking the individual's movements. *Grady v North Carolina*, ___ US ___; 135 S Ct 1368, 1370; 191 L Ed 2d 459 (2015). However, the fact that such action is a "search" does not answer the question whether the satellite-based monitoring program was constitutional because the constitution only protects against "*unreasonable* searches." *Id.* at ___; 135 S Ct at 1371. The United States Supreme Court did not decide this reasonableness question in *Grady*, but instead remanded the case for a determination of the reasonableness of the North Carolina satellite-based monitoring program. *Id.*

---

[4] Defendant argues that she is not subject to LEM because LEM only applies to defendants over 17 convicted of CSC I (or CSC II) when the victim is younger than 13 years. However, this Court has previously rejected this argument. See *People v Johnson*, 298 Mich App 128, 135-136; 826 NW2d 170 (2012); *People v Brantley*, 296 Mich App 546, 557-559; 823 NW2d 290 (2012). According to this Court, "any defendant convicted of CSC-I under MCL 750.520b, regardless of the age of the defendant or the age of the victim, must be ordered to submit to lifetime electronic monitoring." *Brantley*, 296 Mich App at 559. It is true that the Michigan Supreme Court has ordered oral argument on whether to grant an application for leave in a case involving this issue. See *People v Comer*, ___ Mich ___; 876 NW2d 581 (2016). But, until such time as the Supreme Court reaches a different conclusion, *Brantley* and *Johnson* are binding precedent on this Court. MCR 7.215(C)(2), (J)(1). And, because defendant was convicted of CSC I, defendant is subject to LEM.

Following *Grady*, in *People v Hallak*, 310 Mich App 555, 579; 873 NW2d 811 (2015), rev'd in part on other grounds ___ Mich ___; 876 NW2d 523 (2015), this Court held that the use of an electronic monitoring device to monitor the movements of the defendant, who had been convicted of CSC II, constituted a search under the Fourth Amendment, but that such a search of a defendant 17 years or older convicted of CSC II against a person under the age of 13 was not unreasonable. To determine the reasonableness of the intrusion, this Court weighed the public interest in the need to search against the invasion of privacy. *Id.* See also *Grady*, ___ US at ___; 135 S Ct at 1371 ("The reasonableness of a search depends on the totality of the circumstances, including the nature and purpose of the search and the extent to which the search intrudes upon reasonable privacy expectations."). Balancing these interests, this Court found LEM reasonable for a defendant 17 years or older convicted of CSC II against a person under the age of 13, explaining:

> Turning first to the public interest, it is evident that in enacting this monitoring provision, the Legislature was seeking to provide a way in which to both punish and deter convicted child sex offenders and to protect society from a group known well for a high recidivism rate. . . . As the prosecution points out, electronic monitoring not only acts as a strong deterrent, but also assists law enforcement efforts to ensure that these individuals, who have committed " 'the most egregious and despicable of societal and criminal offenses,'" do not frequent prohibited areas (elementary schools, etc.) and remain compliant with the Sex Offenders Registration Act, MCL 28.721 *et seq.* Consequently, when enacting this monitoring system and requiring it only for those 17 or older who commit CSC against children under the age of 13, the Legislature was addressing punishment, deterrence, and the protection of some of the most vulnerable in our society against some of the worst crimes known. As we earlier noted, the "need to prevent the individual offender from causing further injury to society" is a valid consideration in designing a punishment. . . .
>
> Having examined the public interest in this type of monitoring, we now balance that interest against the invasion of defendant's privacy interest. We begin by recognizing that parolees and probationers have a lower expectation of privacy, even in the comfort of their own homes, than does the average law-abiding citizen. The monitoring does not prohibit defendant from traveling, working, or otherwise enjoying the ability to legally move about as he wishes. Instead, the monitoring device simply records where he has traveled to ensure that he is complying with the terms of his probation and state law. MCL 791.285(1) and (3). And although this monitoring lasts a lifetime, the Legislature presumably provided shorter prison sentences for these CSC–II convictions because of the availability of lifetime monitoring. In that regard we also cannot forget that minor victims of CSC–II are often harmed for life. . . . Though it may certainly be that such monitoring of a law abiding citizen would be unreasonable, on balance the strong public interest in the benefit of monitoring those convicted of CSC–II against a child under the age of 13 outweighs any minimal impact on defendant's reduced privacy interest. [*Hallak*, 310 Mich App at 580-581 (internal citations omitted).]

Although *Hallak* considered the reasonableness of LEM for cases involving a defendant 17 years or older convicted of CSC II against a person under the age of 13, we think its public interests analysis and privacy considerations largely apply with equal force to the present case and, following *Hallack*'s reasoning, we conclude that LEM is not an unreasonable search of a defendant who commits CSC I with a student between the ages of 13 and 15 who attended the school where the defendant was employed, MCL 750.520b(1)(b)(*v*). In particular, as noted in *Hallack*, sex offenders, upon release from prison, have a high rate of recidivism. See *McKune v Lile*, 536 US 24, 33-34; 122 S Ct 2017; 153 L Ed 2d 47 (2002). There is a public interest in reducing the recidivism rate of sex offenders, and LEM has a strong deterrent effect. *Hallak*, 310 Mich App at 580. See also *Belleau v Wall*, 811 F3d 929, 935 (CA 7, 2016). Defendants who are convicted of CSC I with a student between the ages of 13 and 15 who attend the school where the defendant is employed are required to register under SORA, MCL 28.722(j), (w)(*iv*); MCL 28.723(1), and LEM assists law enforcement to ensure that these defendants, who have committed egregious and despicable acts against minors by taking advantage of their position at a school, remain compliant with SORA and do not visit prohibited areas, such as schools, *Hallak*, 310 Mich App at 580. Thus, when requiring that defendants who are convicted of CSC I with a student between the ages of 13 and 15 who attend the school where the defendant is employed be subject to LEM, the Legislature was addressing the public interests of punishment, deterrence of highly recidivist offenders, and the protection of minors. *Cole*, 491 Mich at 335-336; *Hallak*, 310 Mich App at 580.

Regarding the privacy interest, as stated in *Hallak*, 310 Mich App at 581, LEM does not prohibit defendants "from traveling, working, or otherwise enjoying the ability to legally move about as [they] wish[]." It simply records where defendants have traveled to ensure that they are complying with the terms of their probation and state law. *Id.* See also *Belleau*, 811 F3d at 935. Additionally, the identity and address, along with other information, of any defendant who is required to register under SORA is available to the public. See MCL 28.728(2). Thus, already as a result of their criminal conduct, defendants convicted of CSC I have their privacy curtailed, meaning that "the *incremental* effect" of LEM is slight because the state has chosen to make information about the defendants public. See *Belleau*, 811 F3d at 934-935. Consequently, balancing the strong public interest in favor of monitoring with any minimal impact on a defendant's reduced privacy, we conclude that LEM for defendants, such as defendant in this case, who are convicted of CSC I against a student between the ages of 13 and 15 who attend the school where the defendant is employed is reasonable under the Fourth Amendment.

## B. CRUEL OR UNUSUAL PUNISHMENT

The United States Constitution, US Const, Am VIII, prohibits cruel and unusual punishments. *Hallak*, 310 Mich App at 569. The Michigan Constitution, Const 1963, art 1, § 16, prohibits cruel or unusual punishment. *Hallak*, 310 Mich App at 569. Because the United States Constitution affords less protection than the Michigan Constitution, if a punishment "passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *People v Nunez*, 242 Mich App 610, 618 n 2; 619 NW2d 550 (2000).

This Court, in determining whether a punishment constitutes cruel or unusual punishment, considers the gravity of the offense and the harshness of the penalty, compares the penalty to penalties for other crimes in this state, compares the penalty to penalties imposed for

the same offense in other states, and considers the goal of rehabilitation. *People v Dipiazza*, 286 Mich App 137, 153-154; 778 NW2d 264 (2009). Regarding rehabilitation, a punishment might be cruel or unusual punishment if "it thwarts the rehabilitative potential of the individual offender and does not contribute toward society's efforts to deter others from engaging in similar prohibited behavior." *People v Coles*, 417 Mich 523, 530; 339 NW2d 440 (1983), overruled in part on other grounds *People v Milbourn*, 435 Mich 630 (1990). The "dominant test" to be used in determining whether a punishment constitutes cruel or unusual punishment is "whether the punishment is so excessive that it is completely unsuitable to the crime." *Id.*

Defendant argues that the statutes imposing LEM for convictions of CSC I are unconstitutional on their face and as applied. A statute may be unconstitutional on its face, meaning that no circumstances exist under which it would be valid. *Keenan v Dawson*, 275 Mich App 671, 680; 739 NW2d 681 (2007). A statute may also be unconstitutional as applied, meaning that the statute is unconstitutional as applied to the particular facts of the case. *Id.* If the statute is constitutional as applied to the defendant, then it is capable of being upheld against a facial challenge. *Hallak*, 310 Mich App at 569. According to defendant, as applied to her, LEM is unconstitutional because nothing indicates that she is likely to be a danger to society. The victim was her first and only victim.

Defendant's as-applied challenge is without merit. First, regarding the gravity of the offense, the CSC I offenses committed by defendant were certainly grave. The victim was a minor between the ages of 13 and 15, who was a student at the school where defendant worked. Sex offenses involving minors are considered particularly egregious, as evinced by the Legislature's provision of heightened protections to minors under a certain age based on the presumption that children's immaturity and innocence prevents them from appreciating the full magnitude and consequences of their conduct. See *People v Benton*, 294 Mich App 191, 205; 817 NW2d 599 (2011). Second, regarding the harshness of the penalty, although defendant is subject to LEM for her lifetime, LEM does not prohibit defendant, upon being released from prison, from traveling, working, or otherwise moving about as she pleases. *Hallak*, 310 Mich App at 581. The monitoring device will only record where defendant has moved to ensure that she is complying with her probation and state law. *Id.* Third, CSC I and CSC II are the only offenses for which LEM is imposed, MCL 750.520n, and CSC II is a less grave offense than CSC I, MCL 750.520b(2)(a); MCL 750.520c(2)(a). In other words, in Michigan, LEM is imposed for a less grave offense than which defendant was convicted, and this Court has previously rejected constitutional challenges to LEM relating to CSC II. See *Hallak*, 310 Mich App at 577. Additionally, although LEM is for defendant's lifetime, it does not exceed the maximum prison sentence for CSC I. MCL 750.520b(2)(a). Fourth, as noted in *Hallak*, at least 10 other states impose LEM for the most serious criminal sexual conduct offenses or criminal sexual conduct with a minor. *Hallak*, 310 Mich app at 575-576, 575 n 9.

Finally, regarding rehabilitation, sex offenders, more so than other offenders, are likely to reoffend upon release from prison. *Hallak*, 310 Mich App at 573-574. LEM addresses the significant concerns of rehabilitation and recidivism of sexual offenders because it has a deterrent effect on would-be reoffenders. *Id.* at 573. Defendant's argument that LEM, as applied to her, constitutes cruel or unusual punishment addresses this factor. However, even though the trial court stated that it did not believe that defendant was likely to reoffend, LEM does not thwart defendant's rehabilitative potential. *Coles*, 417 Mich at 530. Defendant is only

subject to LEM once she is released from prison, MCL 791.285(1), and LEM only ensures that she is complying with the terms of her probation and state law, *Hallak*, 310 Mich App at 581. It does not prevent defendant from moving about as she pleases. *Id.*

Under these circumstances, the punishment of LEM is not so excessive that it is completely unsuitable to the CSC I offenses committed by defendant. *Coles*, 417 Mich at 530. Accordingly, as applied to defendant, LEM does not constitute cruel or unusual punishment. Because defendant cannot succeed on her as-applied challenge under the Michigan Constitution, she cannot succeed on her facial challenge under the state constitution, *Hallak*, 310 Mich App at 577, nor can she succeed on her claim under the United States Constitution, *id.*; *Nunez*, 242 Mich App at 618 n 2.

Defendant's convictions are affirmed, but we remand for further proceedings regarding defendant's sentences. We do not retain jurisdiction.

/s/ David H. Sawyer
/s/ Joel P. Hoekstra
/s/ Kurtis T. Wilder