# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 1, 2022

## JAMES WILLIAM ROSE, ET AL. v. PATRICK M. MALONE

**Appeal from the Chancery Court for Williamson County**
**No. 19CV-48249      Michael Binkley, Judge**

———————————————————

**No. M2021-00569-COA-R3-CV**

———————————————————

This appeal involves a petition for grandparent visitation filed by the maternal grandparents. The trial court granted the petition and the father appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

CARMA DENNIS McGEE, J., delivered the opinion of the court, in which W. NEAL McBRAYER and KRISTI M. DAVIS, JJ., joined.

Judy A. Oxford, Franklin, Tennessee, for the appellant, Patrick M. Malone.

Ashley Goins and Rebecca McKelvey Castañeda, Nashville, Tennessee, for the appellees, James William Rose and Jennie Adams Rose.

## OPINION

### I.      FACTS & PROCEDURAL HISTORY

This is a dispute between a child's father, Patrick M. Malone ("Father"), and the maternal grandparents of the child, James W. Rose and Jennie A. Rose ("Grandfather" and "Grandmother," or collectively, "Grandparents"). Father and Katherine R. Malone ("Mother") were married in 2008. Their only child, B.R.M., was born in 2012. In 2015, Mother filed for a divorce, which resulted in the entry of a final decree of divorce in May 2017. Mother was named primary residential parent and awarded 319 days of parenting time per year, with Father having 46 days. Tragically, Mother was killed in an accident just three months later. Her death was an emotional time for all involved and gave rise to some uncertainty about the child's situation because of Father's work. Father had started a new job requiring him to travel to Texas and Mexico for weeks at a time, and he was unsure how he would manage going forward. After Mother's memorial service, it was

suggested that the child live with the maternal uncle and aunt for a time, but Father was adamant that this would not happen. After the parties discussed the situation, there was no question about Father's intention to return to Nashville and care for the child; the only question was what he needed to do to make that happen. Father was prepared to take the child at this point, but he allowed the child to remain in Grandparents' care for approximately three weeks because he did not want to be insensitive to what they were going through.

Following Mother's death, her estate was probated. Much of the animosity between the parties in this case stems from these probate court proceedings. According to Grandparents, at the first hearing, they requested that the judge consider a trust or guardian ad litem to represent the child because of concerns about Father's financial responsibility. Grandparents wished to establish and preserve a "nest egg" for the child. They believed this was in the child's best interests and claimed that they did not intend to hurt or interfere with Father's ability to parent the child. Conversely, Father claimed that he was the one who first requested a trust be established and that Grandfather opposed him being named a co-trustee. Ultimately, in June 2018, a trust was established, Father was named a co-trustee, and Grandparents were named trust protectors.[1] Grandparents believed that Father took umbrage at their actions to establish the trust and did not appreciate that they were named as trust protectors. Father admittedly believed that Grandparents had the child's best interests in mind, but he took issue with the fact that the proceedings made his life more difficult. According to Father, he eventually agreed to Grandparents being named trust protectors because he just needed the proceedings to be over and was stressed about paying for the child's private school tuition.[2]

After the trust was established in June 2018, Father began opposing contact between Grandparents and the child. He informed Grandparents that the child would not be able to visit them for a July 4th parade, but, according to Grandparents, he did not seem to give a reason why. After some correspondence between the parties, he relented and allowed the child to visit that summer with Grandparents at their cabin in Washington. He determined it would be a positive experience for the child to visit because she would have the opportunity to meet her newborn maternal cousin, who was named after Mother. In November 2018, the child visited with Grandparents again, but it would be the last time they would see or talk to her until July 2019. The parties continued to correspond; however, their conflict escalated.

Beginning in November 2018, Father ignored or denied numerous requests by Grandparents to have contact with the child. He denied or ignored their requests for time

---

[1] According to Grandfather, the role of trust protector allowed them to monitor the money paid out of the trust on a monthly basis. The powers of a "trust protector" are enumerated in Tennessee Code Annotated section 35-15-1201.

[2] Father further explained that he had to pay the child's tuition, but would be reimbursed from the trust.

during Thanksgiving, Christmas, and New Year's Eve. He also denied or ignored several of their requests to FaceTime the child. Nevertheless, Grandparents continued to make requests hoping to repair their relationship in order to see the child. After five months of no contact with the child, Grandparents were unable to engage in any dialogue with Father indicating a change in the situation. Therefore, Grandparents filed a petition for grandparent visitation in April 2019. In their petition, Grandparents stated that the last time they had seen or talked to the child was in November 2018. Before that point, they explained, they saw the child frequently, and they described their relationship with the child as "wonderful." Father filed an answer to the petition in May 2019, requesting that the petition be dismissed. The parties later participated in mediation, but were unable to resolve their differences. As such, the case ultimately went to trial in October 2020.[3]

During the three-day trial, Grandparents, Father, and the paternal grandfather provided testimony. Grandparents had good things to say about Father and maintained that he was a good parent to the child. However, they claimed that their relationship went awry due to the probate court proceedings, and they filed the petition believing it was the only way they would get to see the child. They were hopeful that the parties could repair their relationship after this case concluded, but they ultimately believed that the child would be harmed if visitation was not ordered by the court. Father testified that it was not his intent to deny the child's relationship with Grandparents, but he admitted to denying Grandparents' requests for contact with the child from November 2018 until July 2019. He also had good things to say about Grandparents, but he took issue with their actions in the probate court proceedings. The paternal grandfather believed that Grandparents loved the child and that the child loved them, but he did not believe any harm had come to her from the situation with visitation in the past two years.

The trial court found each witness to be credible and stated that each testified sincerely, honestly, and directly. In February 2021, the trial court entered a memorandum and order granting the petition for grandparent visitation. The trial court found the following: Father expressly and actually opposed grandparents' visitation from June 2018 until April 2019; Tennessee Code Annotated 36-6-306(a)(1) applied because Mother was deceased; there was a clear danger of substantial harm to the child if visitation with Grandparents continued to be denied; and reasonable and regularly-scheduled visitation with Grandparents was in the child's best interests. Following the entry of trial court's order, Grandparents filed a motion for attorney's fees and costs. The trial court entered an order granting in part and denying in part the motion. Thereafter, Father timely filed an appeal.[4]

---

[3] Trial was originally set for May 2020, but was continued to October 2020 due to COVID-19.

[4] After filing the appeal, Father filed a motion for stay moving the trial court to stay the enforcement of its order granting Grandparents' petition for visitation. Grandparents then filed an expedited motion to enforce the court's order. In July 2021, the trial court denied Father's motion to stay and granted in part Grandparents' motion to enforce. The trial court also granted a motion permitting both parties to file a "Proposed Findings of Fact and Conclusions of Law" for purposes of appeal. Furthermore, we note that

## II.   ISSUES PRESENTED

Father presents the following issues for review on appeal, which we have slightly restated:

1. Whether the trial court erred in finding that Father opposed grandparent visitation, when Grandparents had not requested any visitation from December 2018 to April 2019, at which time they filed their petition for grandparent visitation, and testimony demonstrated that Father was not opposed to visitation;
2. Whether the trial court erred in finding that the rebuttable presumption of danger of substantial harm to the child was not overcome, when there was substantial proof the child was doing well and the court stated at trial that the child was doing well;
3. Whether the trial judge erred in finding that it was in the best interests of the child for grandparent visitation to be ordered; and
4. Whether the trial court erred in ordering (a) visitation that was not the minimum visitation for the relationship between Grandparents and the child to be maintained; (b) FaceTime visits every single Sunday evening year-round; and (c) Father to provide notice to Grandparents about extracurricular activities and having to permit them to attend all the activities; such that Father's relationship and activities with the child were frequently interfered with by Grandparents.

Grandparents present similar issues for review on appeal, which we have slightly restated:

1. Whether the trial court correctly found that Father opposed grandparent visitation;
2. Whether the trial court correctly found that Father failed to overcome the rebuttable presumption of danger of substantial harm to the child;
3. Whether the trial court correctly determined that grandparent visitation was in the best interests of the child; and
4. Whether the visitation schedule set forth in the trial court's memorandum and order was reasonable.

For the following reasons, we affirm the decision of the trial court.

## III.   STANDARD OF REVIEW

On appeal, our "[r]eview of findings of fact by a trial court in civil actions is de novo upon the record of the trial court, accompanied by a presumption of correctness of the findings, unless the preponderance of evidence is otherwise." *Manning v. Manning*, 474 S.W.3d 252, 256 (Tenn. Ct. App. 2015) (citing Tenn. R. App. P. 13(d); *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013)). We have explained that "[a] determination of

---

Grandparents filed a motion to dismiss Father's appeal with this Court pursuant to the fugitive disentitlement doctrine, but the motion was denied.

visitation 'often hinges on subtle factors such as the [parties'] demeanor and credibility during the trial proceedings.'" *Id.* (quoting *Battleson v. Battleson*, 223 S.W.3d 278, 282 (Tenn. Ct. App. 2006)). Accordingly, when determinations of credibility and weight of testimony are involved, "considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witness'[s] demeanor and to hear in-court testimony." *Id.* (quoting *Morris v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011)). Our review of conclusions of law by a trial court is de novo, with no presumption of correctness. *McGarity v. Jerrolds*, 429 S.W.3d 562, 566 (Tenn. Ct. App. 2013) (citing *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006) (citation omitted)).

## IV.    DISCUSSION

A dispute between a parent and a grandparent over visitation with a child presents "a conflict between the parent's constitutional right to make decisions about the care and custody of the child and the grandparent's right to visitation under Tennessee Code Annotated section 36-6-306." *Coleman v. Olson*, 551 S.W.3d 686, 697 (Tenn. 2018); *see Smallwood v. Mann*, 205 S.W.3d 358, 362-63 (Tenn. 2006). "The right of a parent to raise a child is a fundamental liberty interest protected by the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution." *Id.* at 697-98 (citing *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993) (citations omitted)). It is well established that a parent's "rights to the care and custody of their children without undue government interference is 'among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions.'" *Id.* at 698 (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 30 (Tenn. 2013) (citation omitted)); *see also State ex rel. Bethell v. Kilvington*, 45 S.W. 433, 435 (Tenn. 1898). Additionally, a parent has "a privacy interest that protects them from unwarranted state intervention in parental decision-making and prohibits the court from imposing its subjective notion of what is in the 'best interests of the child.'" *Id.* (quoting *Hawk*, 855 S.W.2d at 579-80).

Nevertheless, "the state may interfere with these rights when there is a compelling state interest." *Id.* (citing *Smallwood*, 205 S.W.3d at 362-63). Our Supreme Court has explained that "[t]he state has a role of *parens patriae* and a duty to protect minors, and the state may intervene in parental decision-making when necessary to prevent substantial harm to the child." *Id.* (citing *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983) (citation omitted)); *see also Hawk*, 855 S.W.2d at 581 (holding that "neither the legislature nor a court may properly intervene in parenting decisions absent significant harm to the child from those decisions"). A parent is protected from unwarranted state interference in the parenting process by this substantial harm requirement. *Id.* (citing *Hawk*, 855 S.W.2d at 580). Finally, when addressing grandparent visitation rights, this Court must perform a "three-pronged analysis." *McGarity*, 429 S.W.3d at 572 (quoting Marlene Eskind Moses & Jessica J. Uitto, *The Current Status of Tennessee's Grandparent Visitation Law*, 46 Tenn. B.J., 24, 24 (Jan. 2010) (footnotes omitted)). That analysis is described as follows:

First, the grandparent seeking the court's intervention must show that one of six situations exists pursuant to Tenn. Code Ann. § 36-6-306(a). Second, the court must determine whether there is a danger of substantial harm to the child if the child does not have visitation with the grandparent. . . . In conjunction with this analysis, the court must also determine if the relationship between the child and grandparent is significant based on [the] factors set out in Tenn. Code Ann. § 36-6-306(b)(2). Third, if the court finds that there is danger of substantial harm if the child does not have visitation with the grandparent, it must decide whether the visitation would be in the child's best interest based on [eleven] factors under Tenn. Code Ann. § 36-6-307.

*Id.* (quoting Moses & Uitto, *supra*, at 24 (footnotes omitted)).[5]

### *A. Opposition*

For the first prong, Father contends that the trial court erred in finding that he opposed grandparent visitation. The Grandparent Visitation Statute provides in pertinent part:

(a) Any of the following circumstances, when presented in a petition for grandparent visitation to the circuit, chancery, general sessions courts with domestic relations jurisdiction, other courts with domestic relations jurisdiction or juvenile court in matters involving children born out of wedlock . . . , necessitates a hearing *if such grandparent visitation is opposed by the custodial parent* . . . or if the grandparent visitation has been severely reduced by the custodial parent . . . [.]

Tenn. Code Ann. § 36-6-306(a) (emphasis added).[6] This Court has explained that "the Grandparent Visitation Statute is not even implicated unless the grandparent can establish that visitation was opposed [or severely reduced] by the custodial parent before the petition was filed." *In re Trinity P.*, No. M2020-01481-COA-R3-JV, 2021 WL 5816456, at *3 (Tenn. Ct. App. Dec. 8, 2021) (quoting *Uselton v. Walton*, No. M2012-02333-COA-R3-CV, 2013 WL 3227608, at *12 (Tenn. Ct. App. June 21, 2013)) (footnote omitted). Therefore, if the petitioner is unable to prove either opposition to visitation or severe reduction in visitation, "a trial court has no basis for engaging in substantial harm analysis or awarding the petitioner any relief." *Id.* at *4 (quoting *Morisch v. Maenner*, No. W2020-

---

[5] Under a prior version of Tennessee Code Annotated section 36-6-307, there were only seven factors. However, after an amendment in July 2011, Tennessee Code Annotated section 36-6-307 now has eleven factors.

[6] Father does not specifically challenge the trial court's finding that an enumerated statutory circumstance applied, which in this case was Tennessee Code Annotated section 36-6-306(a)(1): "The father or mother of an unmarried minor child is deceased[.]"

00362-COA-R3-JV, 2021 WL 1102364, at *3 (Tenn. Ct. App. Mar. 23, 2021) (citing *Manning*, 474 S.W.3d at 257-58; Tenn. Code Ann. § 36-6-306(b)(c))).[7]

Our Supreme Court has explained that "[t]he term 'opposed' includes situations both where visitation is denied totally and where visitation is technically not opposed, but the frequency and/or conditions imposed by the parents on visitation are such that it equates to a denial of visitation." *Lovlace*, 418 S.W.3d at 21 (quoting *Huls v. Alford*, No. M2008-00408-COA-R3-CV, 2008 WL 4682219, at *8 (Tenn. Ct. App. Oct. 22, 2008)); *see also Angel v. Nixon*, No. M2010-00554-COA-R3-CV, 2010 WL 4483915, at *3 (Tenn. Ct. App. Nov. 8, 2010); *Wilson v. Gladden*, No. E2008-02283-COA-R3-CV, 2009 WL 2176460, at *2 (Tenn. Ct. App. July 22, 2009). Additionally, "the Legislature's use of the words, 'is opposed by,' means actual existing opposition—not likely future opposition." *Coleman*, 551 S.W.3d at 699. Opposition may be proven "by presenting evidence of actual or constructive denial of visitation." *Id.* "Constructive denial occurs when the custodial parent limits or restricts the frequency or conditions of visitation so that it is the same as a denial of visitation." *Id.* at 699-700 (citing *Lovlace*, 418 S.W.3d at 21 (citation omitted)).

The trial court found that Father opposed grandparent visitation with the child from June 2018 until April 2019. The trial court stated in its order that Father denied or ignored Grandparents' requests to communicate with the child and clearly expressed his intent to deny any in-person visitation between Grandparents and the child. Father testified that he was not opposed to visitation; rather, he wanted to be in control of the timing and wanted to avoid court-ordered visitation. He argues in his appellate brief that Grandparents did not request any in-person visitation from December 2018 to April 2019 because they only requested to FaceTime with the child during this period, and FaceTime was not a visit. Thus, he was surprised that Grandparents claimed he was opposed to visitation in their petition.

The text messages between Grandparents and Father tell a different story and demonstrate that the filing of the petition should not have been a surprise to Father. Father began to show opposition toward grandparent visitation in June 2018, when he and Grandmother were discussing whether the child would spend time with Grandparents during the summer. In a text message to Grandmother, Father stated as follows:

> I'm not sure about the 4th. I've also decided that I don't feel comfortable

---

[7] In 2016, the General Assembly amended the Grandparent Visitation Statute changing "the threshold requirements for application of the . . . Statute insofar as the trial court may now consider ordering visitation upon a showing by the petitioning grandparent that visitation, and as a result the grandparent-grandchild relationship, was severely reduced rather than requiring that visitation must have been opposed or denied by the custodial parent." *In re Trinity P.*, 2021 WL 5816456, at *3 n.6 (quoting *Horton v. Cooley*, No. M2019-00945-COA-R3-CV, 2020 WL 2731235, at *4 n.3 (Tenn. Ct. App. May 26, 2020) (quoting *Clark v. Johnson*, No. E2017-01286-COA-R3-CV, 2018 WL 2411203, at *10 (Tenn. Ct. App. May 29, 2018))).

letting her travel to Washington either. After the way you've behaved in court, I can't imagine you and [Grandfather] being very complimentary of me when she stays with you. You've made life more difficult for me than it already is and I'm no longer willing to go out of my way to accommodate you. I was willing to do it for [B.R.M.], but it's reached a point where continuing to do so isn't in her best interest moving forward.

In July 2018, Grandmother responded that she had already purchased a plane ticket for the child to accompany her to Washington and asked Father to let her know if he had a change of heart. She also stated that she thought it was important for the child to have contact with Mother's family and that was something that Mother would want. Father then responded in part, "I'm completely familiar with this sense of entitlement. I was as disgusted by it then as I am now." Father continued to communicate with Grandmother in a manner which we would characterize as a rant. He stated in part, "[Y]our time with her will now be limited" and "I'll reconsider your level of involvement in her life moving forward."

Grandfather testified that Father's behavior changed after the trust for the child was established in June 2018. He believed that Father was upset that Grandparents were named as trust protectors and that this led to tension in their relationship. Father referred to the establishment of the trust as a "Pyrrhic victory" for Grandparents. He then informed Grandparents that the child would not be able to visit them for a July 4th parade. He also did not want the child to visit with Grandparents at their cabin in Washington that same month, but later relented and allowed her to visit. Grandparents saw the child again in November 2018, which was the last time they saw or spoke with the child until after the filing of their petition in April 2019.

Grandfather and Father engaged in back-and-forth correspondence from September 2018 until March 2019, which was largely unproductive. In December 2018, Grandfather made a request to FaceTime the child, but it was ignored. He made another request to FaceTime the child in January 2019, but Father denied his request. Grandfather asked, "how long do you expect this to continue?" Father replied, "Indefinitely. How about until I feel I can trust you again? I'll let you know." After more back-and-forth between them, Father stated, "[W]atch me not message you for the next 6 months. Take care." Grandfather then made several requests for FaceTime calls with the child that Father ignored. At one point, Grandfather asked if they could "bury the hatchet." However, Father replied with a lengthy text message, in which he stated in part, "No, it seems we're pretty far apart on this one." He also stated, "I'm looking forward to not having to deal with you anymore once this is done and I can assure I won't be losing any sleep over it." He concluded this particular conversation by saying, "I can't control what you do, but I can hold you accountable for it with regard to spending time with my daughter. I intend to do just that. Take care."

From November 2018 until March 2019, Grandmother also made several requests

- 8 -

for in-person visits or FaceTime calls with the child, most of which were ignored by Father:

11/4/18, 6:48 PM

**Grandmother:** [B.R.M.] available for a FaceTime at 7 [tonight]?

11/5/18, 8:18 PM

**Grandmother:** Not sure of your travel plans for Thanksgiving or [B.R.M.]'s school schedule, but we would be glad to bring [B.R.M.] to Topeka with us. Tentatively plan to leave Nashville on Sunday and arrive in Topeka on Monday. Could even flex that if needed.

11/22/18, 10:49 AM

**Grandmother:** Happy Thanksgiving! Know you are with family today but we are eager to see [B.R.M.]. We are open tomorrow and/or Saturday. Let us know. Thanks!

11/23/18, 12:41 PM

**Grandmother:** Package arrived here for [B.R.M.]. We are home if you want to pick up.

11/25/18, 12:13 PM

**Grandmother:** Please let us know when you and [B.R.M.] are safely home in Tennessee. Roads are nasty here. Thanks[.]

11/30/18, 3:39 PM

**Grandmother:** We'd like to talk to [B.R.M.] this weekend. Please let us know a good time.

12/2/18, 11:03 AM

**Grandmother:** [Sent a picture of [B.R.M.] sitting with Santa Claus]

**Grandmother:** Hoping to talk to this little elf today.

12/7/18, 10:13 AM

**Grandmother:** Would [B.R.M.] be interested in ice skating lessons again

- 9 -

this year? Only rink I can find is one she attended last year? Fit your schedule?

12/16/18, 7:16 PM

**Grandmother:** [B.R.M.]able to FT tonight? Let me know best time.

2/3/19, 3:02 PM

**Grandmother:** Good time to FT later today?

**Father:** Nope. Busy all day.

2/8/19, 4:23 PM

**Grandmother:** Good time for you this week-end to FT?

3/3/19, 7:50 PM

**Grandmother:** Still awake?

**Father:** iPad is broken. FaceTime on my phone doesn't seem to work. Sorry.

Additionally, there was a group text between Grandmother, Father, and the paternal grandmother, in which Grandmother requested time with the child at the end of 2018:

12/29/18, 5:07 PM

**Grandmother:** We'll plan to pick up [B.R.M.] at 9:30 tomorrow for church and lunch. Let us know when you want her back.

12/29/18, 7:07 PM

**Father:** No . . . from now on you'll be dealing with me and me alone when it comes to time with [B.R.M.]. Despite what you might think, your behavior in and out of court has consistently demonstrated to me that you don't have her best interest at heart and will always put your needs ahead of hers, or anyone else's. You seem to have confused your rank with my authority and my kindness for weakness one too many times. While you may have convinced the court that you're indispensable parties when it comes to her estate, allowing you to whine and complain at [B.R.M.]'s expense whenever you don't get your way. I'm her father and will decide what's in her best

- 10 -

interest everywhere else. I can assure you that you're quite dispensable.

Quite frankly, I think you're horrible people, arrogant, selfish, and entitled. I hear all the lies you tell people and the comments you've made about me and my family. I don't like you, but have always gone out of my way to make sure you were able to spend time with [B.R.M.] despite your behavior. I've decided not to do that anymore though because I no longer feel that's in [B.R.M.]'s best interest, so now you'll actually have something to complain about.

Whenever I hear that you've attempted to contact my mother instead of me directly, I take that as a sign that you simply don't get it and that doesn't help your cause. If you don't hear from me then you aren't spending time with [B.R.M.]. It's that simple. When you start putting her interests ahead of your own then maybe I'll reconsider, but in the meantime she won't be spending time with people who have routinely gone out of their way to make my life difficult, which in turn only makes [B.R.M.]'s life more difficult. Happy New Year's!

**Grandmother:** Over . . . fifteen attempted contacts with you since before Thanksgiving and this your first response.
You think denying us contact with [B.R.M.]for Thanksgiving, Christmas and New Years is the right thing to do?
[Mother] always offered your mom and dad an opportunity to have [B.R.M.]when she came to Topeka, even when you and she were estranged and you prohibited her from telling your mom and dad.

At this point, Grandfather intervened and replied with a lengthy text message, stating in part, "It pains us that you intend to cut us out of her life. Don't know what you gain by doing so except spite." Father then replied with several lengthy text messages. He stated that [Mother] "was busy plotting and scheming" when they had been separated, that "the apple doesn't fall too far from the tree," and that Grandfather was "clueless" and "a weasel." Grandfather then replied, "Hope you get medical attention soon."

Grandmother testified that she was growing tired of Father not responding or sending angry replies that made her feel uncomfortable, so she stopped trying after March 2019. She did not want to be accused of badgering Father. She also explained that they did not request in-person visits throughout this time because they believed FaceTime calls would be an interim step that would lead to in-person visitation. Despite their requests, Grandparents did not have any contact with the child for approximately five months. Thus, Grandparents felt that filing the petition for grandparent visitation in April 2019 was necessary under the circumstances. In July 2019, Grandparents were finally able to exercise visitation with the child after neither seeing nor talking to her for approximately

eight months.  After that, they were able to visit or FaceTime with the child a few times, but it was "minimal" in comparison to the time they had spent with the child before Mother's death.  Father continued to deny many of their requests to visit, have FaceTime calls, or attend the child's extracurricular activities.

The text messages referenced above reveal not only the deterioration of the parties' relationship, but also Father's opposition to grandparent visitation from November 2018 until the petition was filed in April 2019.  As such, we disagree with Father's argument that he did not oppose grandparent visitation, when he consistently denied or ignored Grandparents' requests for any contact with the child for five months.  Furthermore, the fact that Grandparents were only requesting FaceTime calls with the child throughout most of this period does not affect our conclusion.  Black's Law Dictionary defines "visitation," as used in the family law context, as "[a] relative's . . . period of access to a child." *Visitation*, Black's Law Dictionary (11th ed. 2019).  Father denied or ignored Grandparents' requests for any contact or access to the child for five months, whether in person or through FaceTime.

While Father testified that it was not his intent to deny the child's relationship with Grandparents, he clearly communicated to them in his own words that the denial of contact with the child was going to continue "[i]ndefinitely."  He clearly communicated, "If you don't hear from me then you aren't spending time with [B.R.M.]," and then denied or ignored their requests to visit or FaceTime with the child.  He admitted that he ignored their requests from November 2018 until April 2019 and that he could have responded to some of their requests.  He explained that he just did not make it a priority when he should have and was regretful about his actions keeping the child from Grandparents.  Furthermore, he admitted that he did not accept the "olive branch" extended by Grandparents in February 2019, which might have prevented the filing of this petition.  Although Father testified he was technically not opposed to visitation, the evidence preponderates in favor of the finding that there was "actual existing opposition" when the petition was filed.  *Coleman*, 551 S.W.3d at 699.  As such, we conclude that the trial court did not err in finding that Father opposed grandparent visitation.

### B. Substantial Harm

Grandparents carried their threshold burden by showing that Father opposed grandparent visitation, but our analysis does not end here. *See In re Trinity P.*, 2021 WL 5816456, at *4 (explaining that a petitioner must prove either opposition to visitation or severe reduction in visitation before the court can engage in substantial harm analysis or award the petitioner any relief).  We now review the second prong to determine the "presence of a danger of substantial harm to the child." Tenn. Code Ann. 36-6-306(b)(1).  For this issue, the relevant portion of the Grandparent Visitation Statute provides:

(b)(1) In considering a petition for grandparent visitation, the court shall first

determine the presence of a danger of substantial harm to the child. Such finding of substantial harm may be based upon cessation or severe reduction of the relationship between an unmarried minor child and the child's grandparent if the court determines, upon proper proof, that:

. . .

(C) The child had a significant existing relationship with the grandparent and loss or severe reduction of the relationship presents the danger of other direct and substantial harm to the child.

(2) For purposes of this section, a grandparent shall be deemed to have a significant existing relationship with a grandchild if:

(A) The child resided with the grandparent for at least six (6) consecutive months;
(B) The grandparent was a full-time caretaker of the child for a period of not less than six (6) consecutive months; or
(C) The grandparent had frequent visitation with the child who is the subject of the suit for a period of not less than one (1) year.

(3) A grandparent is not required to present the testimony or affidavit of an expert witness in order to establish a significant existing relationship with a grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child. Instead, the court shall consider whether the facts of the particular case would lead a reasonable person to believe that there is a significant existing relationship between the grandparent and grandchild or that the loss or severe reduction of the relationship is likely to occasion severe emotional harm to the child.

(4) For the purposes of this section, if the child's parent is deceased and the grandparent seeking visitation is the parent of that deceased parent, there shall be a rebuttable presumption of substantial harm to the child based upon the cessation or severe reduction of the relationship between the child and grandparent.

Tenn. Code Ann. § 36-6-306(b).

Father concedes that subsection (b)(4) applies here because Mother is deceased and the maternal grandparents are seeking visitation. Rather, Father contends that the trial court erred in finding that the rebuttable presumption of danger of substantial harm to the child was not overcome when there was considerable proof the child was doing well and the court stated at trial that the child was doing well. When subsection (b)(4) applies, we have

explained that the burden of proof shifts from the grandparents to the opposing parent, and the grandparents have the benefit of the rebuttable presumption of substantial harm to the child based upon the cessation of the relationship between the grandparents and the child. *Jackson v. Smith*, No. W2011-00194-COA-R3-CV, 2011 WL 3963589, at *3 (Tenn. Ct. App. Sept. 9, 2011); *see Coleman*, 551 S.W.3d at 699 ("These circumstances created a rebuttable presumption of substantial harm under Tennessee Code Annotated section 36-6-306(b)(4).").

The trial court found that Father's testimony largely supported a finding of harm to the child, rather than rebutting the presumption in Tennessee Code Annotated section 36-6-306(b)(4). Therefore, the trial court concluded that there was a clear danger of substantial harm to the child if visitation with Grandparents continued to be denied. Father asserts he can disprove the trial court's finding that there was a danger of substantial harm to the child. He testified that the child was happy and healthy, and he did not feel as if there was harm to the child from the situation with visitation thus far. The paternal grandfather testified to this as well.

Father believed that consistency was important and that the child would benefit from having certain expectations when it came to visiting Grandparents, but he wanted to have full discretion to approve the visits. He admitted, however, that the frequency of visitation now was nothing like the time Grandparents were able to spend with the child in the past. Before Mother's death, Grandparents saw the child frequently for birthdays, holidays, and vacations. They provided a spreadsheet of in-person visits that they had with the child. Prior to Father's opposition, they visited with the child on nearly 70 different occasions from time of the child's birth in June 2012 until November 2018. From November 2018 until the time of trial in October 2020, they had only visited with the child on seven occasions for a total of 21 hours, two of which were chance encounters. Additionally, they were only permitted to FaceTime the child once in 2019 and once in 2020.

Although the child was handling herself well, she struggled with missing Mother on occasions. There was at least one instance where Father determined that visiting with Grandparents would be beneficial for the child because of this struggle. When the child returned from the visit, Father stated that she was in good spirits. Although Father thought that it was important, he admitted he did not have the means to facilitate the relationships between the child and those who had been associated with Mother. He did not ask the child if she wanted to spend time with Grandparents when he denied them time for Thanksgiving, Christmas, and New Year's Eve in 2018. He did not permit or invite the Grandparents to the child's extracurricular activities, despite knowing that she would like to see Grandparents at these activities. He admitted that the child loved Grandparents and enjoyed being around them. However, after he denied Grandparents contact with her for several months, she became "angry," "reticent," and "guarded" toward them when she was finally able to see them again in July 2019. She was very much aware of Grandparents' absence because she asked why they were not at her school's Grandparents' Day. Because

of this behavior, Grandparents feared that the child would feel abandoned by them or angry with them. They worried that shutting them out would sever the child's connection to Mother and that they would become strangers to the child if they were not allowed to have more involvement. As such, they feared that if visitation was not ordered by the court, the child would lose Mother's family in addition to losing her Mother.

We have held that "the evidence regarding substantial harm must be 'specific to this child's relationship with **this** grandparent.'" *McGarity*, 429 S.W.3d at 579 (citing *Green v. Evans*, M2011-00276-COA-R3-CV, 2012 WL 1107887, at *10 (Tenn. Ct. App. Mar. 20, 2012) (emphasis added)). "Hypothetical evidence of the child's reaction to the cessation of a relationship with another grandparent undoubtedly fails to meet this standard." *Id.* Similar to *Angel*, 2010 WL 4483915, at *4, there is evidence here that the child is generally healthy and happy, but the separation from Grandparents had already begun to have negative effects on the child. In their first visit together after eight months of no contact, the child had to "warm up" to Grandparents after showing signs of restraint and confusion as to why she had not seen them in so long. Furthermore, this case is similar to *Keenan v. Dawson*, 739 N.W.2d 681, 688 (Mich. Ct. App. 2007), a case this Court considered in *McGarity*. Although the Court in *McGarity* found that *Keenan* was not analogous to its facts, we find it instructive. *McGarity*, 429 S.W.3d at 580. Like this case, the child's maternal grandparents in *Keenan* filed a petition for grandparent visitation after the death of their daughter, the child's mother. *Id.* at 576-77 (citing *Keenan*, 739 N.W.2d at 683). The *Keenan* Court ultimately concluded that the child in its case would be substantially harmed by failing to maintain any relationship or memory of his biological mother. *Id.* at 577 (citing *Keenan*, 739 N.W.2d at 688). The Court found that the maternal grandparents were the child's "best chance at learning about his deceased mother." *Id.* (summarizing the conclusion from *Keenan* in regard to substantial harm).

Here, the child had already begun to show the negative effects from her separation from Grandparents, and there is a likelihood that substantial harm would come to her if she was unable to keep Mother's memory alive by maintaining a relationship with them. While Father testified that he talked to the child about Mother frequently, Grandparents were undeniably the child's best connection to Mother's side of the family. Father thought that it was important for the child to maintain the relationships with people who had known Mother, but he admitted he did not have the means to facilitate those relationships. Grandparents were willing and able to fill that role. Without court-ordered visitation, we find that the evidence demonstrates there was a danger of substantial harm to the child. Accordingly, we conclude that the trial court did not err in finding that Father failed to overcome the rebuttable presumption in Tennessee Code Annotated section 36-6-306(b)(4).

### C. Best Interests of the Child

As for the third prong, Father argues that the trial court erred in finding that it was

in the best interests of the child for grandparent visitation to be ordered.  Subsection (c) of the Grandparent Visitation Statute provides:

> (c) Upon an initial finding of danger of substantial harm to the child, the court shall then determine whether grandparent visitation would be in the best interests of the child based upon the factors in § 36-6-307.  Upon such determination, reasonable visitation may be ordered.

Tenn. Code. Ann. § 36-6-306(c).  Following its consideration of the applicable factors, the trial court found that visitation with Grandparents was in the child's best interests.  The best interests factors include, but are not necessarily limited to, the following:

> (1) The length and quality of the prior relationship between the child and the grandparent and the role performed by the grandparent;
>
> (2) The existing emotional ties of the child to the grandparent;
>
> (3) The preference of the child if the child is determined to be of sufficient maturity to express a preference;
>
> (4) The effect of hostility between the grandparent and the parent of the child manifested before the child, and the willingness of the grandparent, except in case of abuse, to encourage a close relationship between the child and the parent . . . of the child;
>
> (5) The good faith of the grandparent in filing the petition;
>
> (6) If the parents are divorced or separated, the time-sharing arrangement that exists between the parents with respect to the child;
>
> (7) If one (1) parent is deceased or missing, the fact that the grandparents requesting visitation are the parents of the deceased or missing person;
>
> (8) Any unreasonable deprivation of the grandparent's opportunity to visit with the child by the child's parents . . . , including denying visitation of the minor child to the grandparent for a period exceeding ninety (90) days;
>
> (9) Whether the grandparent is seeking to maintain a significant existing relationship with the child;
>
> (10) Whether awarding grandparent visitation would interfere with the parent-child relationship; and

(11) Any court finding that the child's parent . . . is unfit.

Tenn. Code Ann. § 36-6-307.

The first and second factors weigh in favor of ordering visitation. Grandparents had been involved in the child's life since she was born. They had spent a lot of time together, had fun together, and had even been given the nicknames "Papa" and "Honey" by the child. Their relationship was described as wonderful. Prior to Father's opposition, they visited with the child on nearly 70 different occasions over the course of a six-year period. Father admitted that the child and Grandparents had a loving relationship and the child loved and enjoyed being with them. The child was comforted by them after Mother's death and was happy to see them when she was allowed to. The third factor, the preference of the child, is inapplicable because there was no determination that the child was of sufficient maturity to express a preference.

The fourth and fifth factors weigh in favor of ordering visitation. After Mother's death in August 2017, the parties began to have conflict with each other during the probate of her estate. They engaged in name-calling and lengthy exchanges of no productive value. Although it affected their relationship with each other, their conflict was never manifested before the child. Despite their differences, Grandparents maintained that Father was a good parent and continued to encourage the child's relationship with him after Mother's death. The parties were always cordial in person and hoped to repair their relationship after this case was over. Grandparents felt the filing of their petition was necessary due to the lack of contact that they had had with the child. The trial court credited Grandparents' testimony and found no indication of bad faith on their part. The sixth factor is inapplicable in light of Mother's death.

The next four factors weigh in favor of ordering visitation. Grandparents were the parents of Mother, a deceased parent of the child. Beginning in November 2018, Father denied or ignored Grandparents the opportunity to visit or FaceTime with the child for approximately five months, which exceeded a period of 90 days. Grandparents testified that the petition was filed for the purpose of maintaining their relationship with the child. They worried that they would become strangers to the child if Father's opposition was allowed to continue. They were not attempting to hurt Father or undermine his authority as a parent. Father admitted that allowing Grandparents more participation in the child's activities would not subtract from his parenting time. There was no finding by the trial court that Father was unfit to parent the child, and the final factor is therefore inapplicable.

In light of our review of these factors, we conclude that the trial court did not err in finding that it was in the best interests of the child for grandparent visitation to be ordered.

### D. Reasonable Visitation

- 17 -

The crux of Father's final issue concerns the reasonableness of the trial court's award of grandparent visitation.  The trial court's order included the following in regard to visitation:

1**. Visitation.**  Grandparents shall have in-person visitation with [B.R.M.], every year, at the following times:

- Mother's Day weekend, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday;

- Up to ten (10) consecutive days in July.  Grandparents shall notify Father, in writing, of their proposed dates for this visitation time no later than May 15 of each year;

- The weekend closest to Mother's birthday in September, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday;

- The weekend prior to Thanksgiving, from after school on Friday (or 3:00 p.m., if school is not in session) until 5:00 p.m. on Sunday.

2. **Location.**  The location for Grandparents' visitation shall be any location of their choosing.  The place of exchange shall be Father's residence, unless otherwise agreed.  Grandparents shall be responsible for making any necessary transportation arrangements for [B.R.M.], and shall be responsible for all costs associated with transportation and visitation.  Grandparents shall provide to Father, in writing, a detailed itinerary for their visits, no later than three (3) days prior to the beginning of their visits.

3. **FaceTime.**  Grandparents shall be allowed one (1) FaceTime call with [B.R.M.] each week, at 7:00 p.m. on Sunday for thirty (30) minutes unless otherwise agreed.  Father will facilitate these FaceTime calls.

4. **Extracurricular Activities.**  Upon written request from Grandparents, Father shall promptly provide to Grandparents an updated written schedule of [B.R.M.]'s extracurricular activities which are open to attendance by the public or by family members, including sporting events, school functions such as Grandparents' Day, and Chapel.  Grandparent shall provide to Father at least forty-eight (48) hours' written notice of their intent to attend any of [B.R.M.]'s extracurricular activities.

(a) In the event [B.R.M.] has any regularly-scheduled extracurricular activity during Grandparents' visitation time, Grandparents shall either: (i)

facilitate [B.R.M.]'s attendance at her scheduled activities; or (ii) forego their visitation.

(b) In the event [B.R.M.]has any regularly-scheduled extracurricular activity during the time for Grandparents' weekly FaceTime call, Father shall notify Grandparents in writing of an alternative time for their weekly call.

5. The parties remain free to supplement or modify this visitation schedule by written agreement.

Father asserts that his relationship and activities with the child were frequently interfered with by Grandparents due to the trial court's award of grandparent visitation. Father specifically argues that the trial court erred in ordering (a) visitation that was not the minimum visitation for the relationship between Grandparents and the child to be maintained; (b) FaceTime visits every Sunday evening year-round; and (c) Father to provide notice to Grandparents about extracurricular activities and having to permit them to attend all the activities.

"Appellate review of a visitation order is governed by an abuse of discretion standard, with the child's welfare given paramount consideration." *Smallwood*, 205 S.W.3d at 361 (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). "Even when grandparents satisfy the initial requirements necessary to obtain visitation, the visitation schedule must be carefully crafted *both* to afford grandparents the visitation necessary to avoid substantial harm to the child *and* to minimize, to the extent possible, interference with the parent-child relationship." *Lovlace*, 418 S.W.3d at 31. Additionally, "[t]he level of visitation necessary to minimize harm is dependent on the unique facts of each case." *In re Diawn B.*, No. M2017-01159-COA-R3-JV, 2018 WL 3530838, at *4 (Tenn. Ct. App. July 23, 2018); *see In re Dayton R.*, No. W2015-01848-COA-R3-JV, 2016 WL 1403255, at *7 (Tenn. Ct. App. Apr. 7, 2016). Nevertheless, it is not this Court's role to "tweak" an award of grandparent visitation "in the hopes of achieving a more reasonable result than the trial court." *Marlow v. Parkinson*, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007) (quoting *Eldridge*, 42 S.W.3d at 88). Therefore, "a trial court's decision regarding . . . visitation will be set aside only when it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.'" *Id.* (quoting *Eldridge*, 42 S.W.3d at 88).

Upon reviewing the trial court's award of grandparent visitation, we are not persuaded that it was unreasonable. Contrary to Father's argument on appeal, much of the visitation that was awarded were proposals he found agreeable when he testified. He testified that he was willing to entertain a set day and time each week for the child to FaceTime with Grandparents, which was what the trial court ordered. He also testified that his parenting time would not be interfered with by allowing Grandparents to attend the child's extracurricular activities, which was what the trial court ordered. Moreover, the trial court noted in its order that it took care to minimize any potential interference with the

parent-child relationship and considered Father's testimony heavily, which we find that it did. In regard to weekend visitation, the trial court took into consideration Father's preference to have the child returned by Sunday evening instead of allowing Grandparents to transport the child to school on Monday morning. Father thought that Grandparents' proposal of two-and-a-half consecutive weeks during the summer was too much, and the trial court reduced it to a maximum of ten days during July. There were only four visitation periods awarded by the trial court, and all of them were important for the child to continue her connection with Mother's family and to maintain her memory of Mother. Two of the visitation periods were Mother's Day weekend and the weekend closest to Mother's birthday. The other two visitation periods—the ten days in July and the weekend before Thanksgiving—were traditions that Grandparents had with the child and Mother when she was still alive.

This Court has held that a "trial court abuses its discretion when it 'acts contrary to uncontradicted substantial evidence and ignores valid criteria.'" *In re Dayton R.*, 2016 WL 1403255, at *7 (quoting *Gooding v. Gooding*, 477 S.W.3d 774, 779 (Tenn. Ct. App. 2015) (citations omitted)). In this case, we cannot conclude that the trial court committed such error. The trial court's award of visitation was "carefully crafted," *Lovlace*, 418 S.W.3d at 31, and was within the appropriate "spectrum of rulings," *Marlow*, 236 S.W.3d at 748 (quoting *Eldridge*, 42 S.W.3d at 88). As a final argument, Father requests that the schedule be modified so that it is minimal, without overnight visits, and excludes FaceTime and any notices or attendance by Grandparents at extracurricular activities. However, as stated before, it is not our role to "tweak" an award of grandparent visitation "in the hopes of achieving a more reasonable result than the trial court." *Marlow*, 236 S.W.3d at 748 (quoting *Eldridge*, 42 S.W.3d at 88). Accordingly, we decline to modify the visitation schedule and find that the trial court's award of visitation was not an abuse of discretion.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court. Costs of this appeal are taxed to the appellant, Patrick M. Malone, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

- 20 -